

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-11-1998

# Larsen v. Senate of The Commonwealth

Precedential or Non-Precedential:

Docket 97-7296,97-7451

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

## Recommended Citation

"Larsen v. Senate of The Commonwealth" (1998). *1998 Decisions*. Paper 193.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/193

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 11, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-7296, 97-7451

ROLF LARSEN

v.

SENATE OF THE COMMONWEALTH OF PENNSYLVANIA;
ROY C. AFFLERBACH; ANTHONY B. ANDREZESKI;
GIBSON E. ARMSTRONG; EARL BAKER; ALBERT V.
BELAN; CLARENCE D. BELL; LEONARD J. BODACK;
MICHAEL E. BORTNER; DAVID J. BRIGHTBILL;
J. DOYLE CORMAN; MICHAEL M. DAWIDA; MICHAEL
                 B.
FISHER; VINCENT J. FUMO; STEWART J. GREENLEAF;
MELISSA A. HART; DAVID W. HECKLER, EDWARD W.
HELFRICK; EDWIN G. HOLL; ROXANNE H. JONES;
ROBERT C. JUBELIRER; GERALD J. LAVALLE;
CHARLES D. LEMMOND, JR.; H. CRAIG LEWIS;
J. WILLIAM LINCOLN; F. JOSEPH LOEPER; ROGER
                 A.
MADIGAN; BRUCE S. MARKS; ROBERT J. MELLOW;
HAROLD F. MOWERY, JR.; RAPHAEL J. MUSTO;
MICHAEL A. O'PAKE; FRANK A. PECORA; JOHN E.
PETERSON; EUGENE E. PORTERFIELD; TERRY L. PUNT;
JEANETTE F. REIBMAN; JAMES J. RHOADES;
ROBERT D. ROBBINS; FRANK A. SALVATORE;
ALLYSON Y. SCHWARTZ; TIM SHAFFER; JOHN J.
SHUMAKER; PATRICK J. STAPLETON; WILLIAM J.
STEWART; J. BARRY STOUT; RICHARD TILGHMAN; JACK
WAGNER; NOAH W. WENGER; HARDY WILLIAMS;
SUPREME COURT OF PENNSYLVANIA; ROBERT NIX;
JOHN FLAHERTY; STEPHEN ZAPPALA; NICHOLAS
PAPADAKOS; RALPH CAPPY; FRANK MONTEMURO;
RONALD CASTILLE; COMMONWEALTH OF
PENNSYLVANIA COURT OF JUDICIAL DISCIPLINE;
JOSEPH F. MCCLOSKEY; WILLIAM F. BURNS;
DAWSON R. MUTH; PETER DEPAUL; CAROL K.
MCGINLEY; CHRISTINE L. DONOHUE; JUSTIN M.

JOHNSON; WILLIAM CASSENBAUM; JUDICIAL CONDUCT
BOARD; JOSEPH A. DEL SOLE; ARTHUR J. EDMUNDS;
DIANE M. EDMUNDSON; GERALD P. EGAN; JOHN W.
HERRON; FREDERICK WELLS HILL; MATTHEW ANITA
MACDONALD; GERALD J. O'CONNOR; ANDREW PALM;
CHARLES W. RUBENDALL, II; JAMES E. RUSSO;
BERNARD C. WATSON; WILLIAM J. ARBUCKLE, III;
BRUCE A. ANTKOWIAK; THOMAS A. BERGSTROM;
ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS;
NANCY M. SOBOLEVTICH; DAVID A. FRANKFORTER,
in their official and individual capacities;
INDIVIDUAL SENATORS

Roy C. Afflerbach, Anthony B. Andrezeski, Gibson E.
Armstrong, Earl Baker, Albert V. Belan, Clarence D. Bell,
Leonard J. Bodack, Michael E. Bortner, David J. Brightbill,
J. Doyle Corman, Michael M. Dawida, Michael B. Fisher,
Vincent J. Fumo, Stewart J. Greenleaf, Melissa A. Hart,
David W. Heckler, Edward W. Helfrick, Edwin G. Holl,
Roxanne H. Jones, Robert C. Jubelirer, Gerald J. Lavalle,
Charles D. Lemmond, Jr., H. Craig Lewis, J. William
Lincoln, F. Joseph Loeper, Roger A. Madigan, Bruce S.
Marks, Robert J. Mellow, Harold F. Mowery, Jr., Raphael J.
Musto, Michael A. O'Pake, Frank A. Pecora, John E.
Peterson, Eugene E. Porterfield, Terry L. Punt, Jeanette F.
Reibman, James J. Rhodes, Robert D. Robbins, Frank A.
Salvatore, Allyson Y. Schwartz, Tim Shaffer, John J.
Shumaker, Patrick J. Stapleton, William J. Stewart,
J. Barry Stout, Richard A. Tighman, Jack Wagner,
Noah W. Wenger and Hardy Williams
("the individual Senators")

        Appellants

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 95-cv-01540)

2

Argued May 19, 1998

Before: SLOVITER, GREENBERG, and GIBSON,*
Circuit Judges

(Filed August 11, 1998)

        Arlin M. Adams (Argued)
        Joseph T. Lukens
        Michael J. Barry
        Schnader, Harrison, Segal & Lewis
        Philadelphia, PA 19103

        Morey M. Myers
        Myers, Brier & Kelly
        Scranton, PA 18503

        Harold I. Goodman
        Arthur G. Raynes
        Stephen E. Raynes
        Raynes, McCarty, Binder, Ross &
         Mundy
        Philadelphia, PA 19l03

         Attorneys for Appellants

        W. Thomas McGough, Jr.
        Reed, Smith, Shaw & McClay
        Pittsburgh, PA 15219

        Cletus P. Lyman (Argued)
        Michael S. Fettner
        Lyman & Ash
        Philadelphia, PA 19l03

         Attorneys for Appellee
         Rolf Larsen
_____

* Hon. John R. Gibson, United States Senior Circuit Judge for the United
States Court of Appeals for the Eighth Circuit, sitting by designation.

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Rolf Larsen, former Justice of the Supreme Court of Pennsylvania, brought suit under 42 U.S.C. S 1983 against a large number of Pennsylvania entities and individuals. In the portions of the amended complaint at issue in the appeals before us, he asserted various constitutional claims against the Senate of the Commonwealth of Pennsylvania and individual Pennsylvania state Senators for their role in his impeachment and removal from office. Defendants filed a variety of motions in the district court challenging Larsen's right to maintain this action. Currently before us are consolidated appeals filed by individual Senators who challenge the district court's rulings rejecting the claims of nonjusticiability, absolute legislative immunity and qualified immunity arising out of Larsen's failure to demonstrate any property interest in his position as Justice. A related appeal in number 97-7153, which was filed by the individual Justices of the Supreme Court of Pennsylvania and employees of the Administrative Office of the Pennsylvania Courts and which concerns the termination of Larsen's medical benefits, was argued before the same panel of this court, and is the subject of a separate opinion.

I.

Background

Larsen was first elected to the Supreme Court of Pennsylvania in 1977 for a ten-year term beginning January 1978, and was reelected for a second ten years as of 1988. In that year, the Pennsylvania Judicial Inquiry Review Board ("JIRB") charged him with several violations of the Pennsylvania Constitution. In 1991, the JIRB issued a report to the Supreme Court of Pennsylvania in which the Board found that Larsen, while acting without improper motive, had created an appearance of impropriety by

4

engaging in ex parte meetings with a trial judge presiding over cases in the Court of Common Pleas. The report recommended that Larsen be publicly reprimanded. On October 14, 1992, the Supreme Court (by Justices Zappala and Cappy with Justice Papadakos dissenting and voting for remand to the JIRB) issued a per curiam order, without opinion, adopting the JIRB's recommendation. See In re Larsen, 616 A.2d 529 (Pa. 1992).

On November 24, 1992, Larsen filed a petition for the recusal and disqualification of Justices Zappala and Cappy. The petition alleged that those Justices had not been impartial and had improper motives throughout the investigation of Larsen and in deciding to adopt the JIRB's report and recommendation. Larsen also accused then-Chief Justice Nix of having improperly interfered with a pending trial in Lehigh County and with the petition for allowance to file an appeal in that case.

In response to Larsen's petition, Pennsylvania Attorney General Preate appointed two special counsels to investigate Larsen's accusations. After almost a year of grand jury hearings, the grand jury found no credible evidence to support Larsen's allegations. It did, however, identify two areas of alleged misconduct by Larsen. They were that, over the previous ten years, Larsen had maintained a list of petitions for allowance of appeal to be given special treatment and had regularly obtained prescription drugs for his own use by causing doctors to issue prescriptions in the names of his staff members. On October 22, 1993, the grand jury recommended that criminal charges be filed against Larsen for the latter. Several days later, on October 28, 1993, Larsen was formally charged with violating and conspiring to violate the Controlled Substances Act, 35 Pa. Cons. Stat. S 780-101, et seq. That same day, the Supreme Court relieved Larsen of all responsibilities as a Justice, though he continued to receive his salary.

On April 9, 1994, after a five-day trial in the Court of Common Pleas, Larsen was convicted by a jury of two counts of conspiring to violate the Controlled Substances Act. On May 24, the Pennsylvania House of Representatives, which had been investigating Larsen for

months, adopted seven Articles of Impeachment against him. They included (I) according special treatment to certain petitions for allowance of appeal in cases where his friends were counsel of record who had made political contributions to him, (II) having ex parte communications with one such counsel and voting consistent with that counsel's position, (III) lying before the grand jury that was investigating him, (IV) communicating with a trial judge regarding a case pending before her and providing extra-record information beneficial to a party represented by one of Larsen's friends, (V) making allegations in bad faith against Justices Zappala and Cappy, (VI) obtaining prescription drugs for his own use in the names of his staff members, and (VII) undermining confidence in the judiciary and betraying the trust of the people of Pennsylvania.

Pursuant to the Senate Rules of Practice and Procedure for Impeachment Trials, the President Pro Tempore of the Senate appointed a committee of six senators to conduct evidentiary hearings regarding the allegations contained in the Articles of Impeachment. On September 20, after a month of hearings before the committee, the full Senate heard oral argument on Larsen's pretrial motions in which he requested, inter alia, that his trial be held before the full Senate as opposed to a committee, that certain senators recuse themselves, and that he be allowed to take discovery. All of Larsen's motions were denied without debate. On September 27, the senate committee provided the full Senate and Larsen's counsel with a copy of its final report, containing a summary of the evidence presented at the hearings, and, at the same time, the full Senate heard closing arguments from both sides. On October 4, 1994, the Senate voted 44 to 5 to convict Larsen on Article II and to acquit him on the other six articles. The Senate then voted unanimously to bar Larsen from holding any office of trust or profit in Pennsylvania in the future.

On June 13, 1994, the Court of Common Pleas sentenced Larsen on his criminal conviction to probation and community service, later suspended pending appeal. In addition, pursuant to the Pennsylvania Constitution, the

6

trial judge removed Larsen from office as a Justice of the Supreme Court.[1]

II.

Procedural History

Larsen instituted the present S 1983 action on September 13, 1995. His 30-page amended complaint names the Pennsylvania Senate, the Supreme Court, the Administrative Office, the Judicial Conduct Board, the Court of Judicial Discipline and the individual members of each entity in their official and personal capacities. Only Part I of the amended complaint, containing Larsen's claims against the Senate and individual Senators, is relevant to this appeal. There, Larsen alleges in subpart (a) that he was denied rights secured by the Sixth Amendment and the Due Process Clauses of the Fourteenth Amendment of the United States Constitution, listing approximately twenty examples of ways in which the procedures he was accorded allegedly fell below constitutional standards. In subpart (b), Larsen alleges that the statements contained in his petition for the disqualification and recusal of two of his fellow justices were substantial and motivating factors in his removal from office in violation of the First Amendment of the United States Constitution. Larsen seeks compensatory and punitive damages from the Senators in their personal capacities. In the Senators' official capacities, Larsen seeks "declaratory and injunctive relief, voiding the Senate impeachment verdict of guilty on Article II." App. at 97.

In the district court, the Senators moved to dismiss Part I of the amended complaint on the grounds, among others, that Larsen's claims are not justiciable, that they are barred by the Eleventh Amendment to the United States Constitution, that the Senators are entitled to absolute legislative immunity, and that the complaint failed to state

_____

1. On appeal, the Superior Court affirmed Larsen's conviction and remanded only for a recalculation of his term of probation. See Commonwealth v. Larsen, 682 A.2d 783 (Pa. Super. 1996), appeal denied, 692 A.2d 564 (Pa. 1996).

a claim upon which relief could be granted. The district court ruled that Larsen's claims against the Senate and the Senators were not "political questions" and were justiciable. With respect to the immunity issues, the court dismissed Larsen's claims against the Senate as barred by the Eleventh Amendment, but held that the Eleventh Amendment did not bar Larsen's claims for injunctive and declaratory relief against the individual Senators in their official capacities. In addition, the court dismissed Larsen's claims for damages against the Senators in their personal capacities, holding that the Senators were entitled to absolute legislative immunity from those claims. Turning to the merits, the court reasoned that Larsen had a"highly circumscribed" property interest in his position and that "for the most part, whatever procedural safeguards to which he was entitled pursuant to the Fourteenth Amendment were met by the impeachment proceedings." Larsen v. Senate of the Commonwealth of Pa. (Larsen I), 955 F. Supp. 1549, 1570 (M.D. Pa. 1997). As a result, the court then dismissed the vast majority of Larsen's due process allegations for failure to state claims upon which relief could be granted.

On the Senators' motion for reconsideration, the court refused to reconsider its holding that absolute legislative immunity did not preclude the claims seeking prospective injunctive relief in the Senators' official capacities. Larsen v. Senate of the Commonwealth of Pa. (Larsen II ), 965 F. Supp. 607, 612 (M.D. Pa. 1977). The court did, however, agree to certify for immediate appeal under 28 U.S.C. S 1292(b) its rulings on the issue whether Larsen possessed a constitutionally protected property interest in his position.

The district court had jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. SS 1331 and 1343. A motions panel of this court granted the Senators' motion to permit the interlocutory appeal with respect to the issue whether Larsen had a constitutionally protected property interest in the elected office of Justice of the Supreme Court of Pennsylvania and, if so, the extent of that interest. We therefore have appellate jurisdiction over that issue pursuant to 28 U.S.C. S 1292(b).

8

The Senators also appeal from the district court's partial denial of their claim to absolute legislative immunity. We regard the denial of the Senators' claim of absolute legislative immunity as analogous to the denial of a government official's right to claim either absolute or qualified immunity, which the Supreme Court held in Mitchell v. Forsyth, 472 U.S. 511 (1985), is immediately appealable under the collateral order doctrine first articulated in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949). Therefore, we have appellate jurisdiction over that claim pursuant to 28 U.S.C. S 1291. Our review of the district court's disposition of a motion to dismiss is plenary. See generally Morse v. Lower Merion Sch. Dist., 132 F.2d 902, 906 (3d Cir. 1997).

III.

Justiciability

The Senators press their contention that Larsen's claim is not justiciable despite the failure of the motions panel to accept that issue for certification under 28 U.S.C. S 1292(b). We agree that it is not only an issue that we can reach, but one that we must reach. The Supreme Court made clear this past term that a federal court cannot proceed to consider the merits of an action until it is satisfied that the dispute falls within the class of cases or controversies to which Article III, S 2 of the United States Constitution has extended the judicial power of the United States. In Steel Co. v. Citizens for a Better Environment, 118 S. Ct. 1003 (1998), the Court disapproved the "doctrine of hypothetical jurisdiction" by which some courts "assumed" jurisdiction for the purpose of deciding the merits. The Court in Steel Co. emphasized that a court that is without proper jurisdiction cannot proceed at all, and must merely note the jurisdictional defect and dismiss the suit. Id. at 1012; see also McNasby v. Crown Cork and Seal Co., 832 F.2d 47, 49 (3d Cir. 1987) ("this court has a `special obligation' to satisfy itself of its own jurisdiction in every appeal presented to it") (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534 (1986)).

It may be that the motions panel did not certify the district court's denial of the motion to dismiss for lack of justiciability because it believed that issue alone did not qualify for interlocutory appeal under S 1292(b). But once it did grant the petition of the Senators and certified the issues whether Larsen had a property interest in the office of Justice and the extent of that interest, we became free to address any matter necessary to our decision of those issues. See Dailey v. Nat'l Hockey League, 987 F.2d 172, 175 (3d Cir. 1993). A somewhat similar issue arose in Ivy Club v. Edwards, 943 F.2d 270, 275 (3d Cir. 1991), where we held that before reaching the merits of the issue raised by the S 1292(b) certification, we were obliged to determine whether that issue was moot, notwithstanding the fact that the mootness question was not one of the issues certified for appeal. See id. at 275–76. In like manner, we have an obligation to determine whether the instant controversy is justiciable prior to our reaching the merits of the issues certified for appeal.

Once we turn to the issue of justiciability, wefind that the basis of the Senators' objection trenches upon, but does not follow, traditional justiciability analysis. The Senators concede that "[t]he issue of justiciability presented here is not so much a `political question' as it is one of federalism and of a proper respect for state functions." Appellants' Br. at 24. That is an apt characterization. In its seminal opinion in Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court noted that "[t]he nonjusticiability of a political question is primarily a function of the separation of powers." Id. at 210. It continued, "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the`political question.' " Id. Thus, because the issues raised by Larsen call upon us to review the actions of a state legislature as opposed to the acts of one of the political branches of the federal government, the case does not present a typical "political question" as that term has come to be defined. Nevertheless, the Senators rely on the political question cases and argue that their reasoning applies with equal force here.

The Senators first rely on the Supreme Court's decision in Nixon v. United States, 506 U.S. 224 (1993), holding nonjusticiable a federal judge's challenge to his impeachment. Walter Nixon, a former United States district judge, filed suit contending that his impeachment trial before a committee of the United States Senate, as opposed to the full Senate, violated the command of Article I of the United States Constitution that "[t]he Senate shall have the sole Power to try all Impeachments," U.S. Const. art. I, S 3, cl. 6. See Nixon, 506 U.S. at 226. The Court reasoned that the word "try" lacked judicially discoverable and manageable standards and that the word "sole" constituted a "textually demonstrable constitutional commitment" to the Senate. Id. at 229-36. It stated that "[a] controversy is nonjusticiable--i.e., involves a political question--where there is `a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.' " Id. at 228 (quoting Baker, 369 U.S. at 217). Accordingly, it held that Nixon's claim was nonjusticiable. Id. at 237-38.

The Senators argue that, as in Nixon, there is a lack of judicially manageable standards rendering this case nonjusticiable. We do not agree that Nixon controls our analysis, and note that the Supreme Court has cautioned that "[m]uch confusion results from the capacity of the `political question' label to obscure the need for case-by-case inquiry." Baker, 369 U.S. at 210-11. Larsen's claims do not implicate Article I, S 3, cl. 6 of the United States Constitution and thus the language of the phrase assigning to the Senate trial of all impeachments is not the issue in this suit. Larsen's challenge to his impeachment is based primarily on the Due Process Clause of the Fourteenth Amendment and the Freedom of Speech Clause of the First Amendment. Both areas of the law are firmly within the domain of the federal judiciary and both are the subject of judicially developed legal principles that guide our decisions. Unlike the political question cases, where the "court[s] acknowledge[ ] the possibility that a constitutional provision may not be judicially enforceable," United States Dept. of Commerce v. Montana, 503 U.S. 442, 458 (1992),

11

issues involving the First and Fourteenth Amendments are regularly enforced by judicial decision.

The Senators turn again to Nixon as support for their argument that concerns for finality and the logistical difficulties that would be presented in the event of an order for Larsen's reinstatement counsel against federal court review of his impeachment proceedings. In Nixon , the Court stated that "we are persuaded that the lack offinality and the difficulty of fashioning relief counsel against justiciability." Id. at 236 (citing Baker, 369 U.S. at 210). In its discussion, the Court noted the uncertainty of"the question of what relief a court may give other than simply setting aside the judgment of conviction. Could it order the reinstatement of a convicted federal judge, or order Congress to create an additional judgeship if the seat had been filled in the interim?" Id.

We do not discount the similar difficulties that would be presented in fashioning a remedy for an impeached state judge. However, the Nixon case does not provide a basis for finding nonjusticiability on that ground. In Nixon, the Court explicitly relied on the finality argument only"[i]n addition to the textual commitment argument." Id. at 236. There is no indication in Nixon or any other case cited by the Senators that, absent a textual commitment to a coordinate branch of the federal government, concerns for finality and the difficulty in formulating appropriate relief alone would suffice to render a case nonjusticiable.

The only injunctive relief explicitly sought in the portion of Larsen's amended complaint directed to the Senators is that the court vacate and declare void the conviction of impeachment, relief that could be granted without ordering his reinstatement to the bench. We do note that although Larsen's amended complaint does not include a prayer for reinstatement, the district court understood he was seeking that relief, see 955 F. Supp. at 1557, and Larsen so indicated in this court. Nonetheless, while the difficulty of ordering such relief is relevant in our analysis of a different issue, for the reasons set forth above it is not alone a basis to find the claim nonjusticiable.

Finally, the Senators make the broad argument that " `Our Federalism' counsels strongly against federal courts

12

interfering in state impeachment proceedings which are not reviewable in state courts and which would not be justiciable if they were federal proceedings." Appellants' Br. at 22. They argue that the Pennsylvania Constitution is virtually identical in relevant respect to the United States Constitution and that we must honor its "textually demonstrable commitment" of the responsibility for conducting impeachment trials to the Pennsylvania Senate. However, we are aware of no cases in which the justiciability of a particular claim has turned on a textually demonstrable commitment appearing in any text other than the United States Constitution. A federal court derives its authority to hear a particular case or controversy from the United States Constitution and the various acts of Congress, and no provision removes cases of this kind from federal court jurisdiction.

The Senators cite as "instructive" the decision in Davids v. Akers, 549 F.2d 120 (9th Cir. 1977), but the court in that case did not abjure jurisdiction. There, Democratic members of the Arizona House of Representatives brought a S 1983 action alleging that they had been denied equal protection and certain First Amendment rights when the Republican Speaker of the House assigned proportionally more Republicans to the standing committees than their ratio to the number of House Democrats. Although the court characterized the idea of a federal court meddling in the internal affairs of a state legislature as "startlingly unattractive," id. at 123, it rejected the defendants' justiciability argument on the ground that there was no separation of powers concern. Id. at 126. Once it reached the merits, it approved the entry of summary judgment for the defendants on the ground that plaintiffs had failed to state a constitutional claim upon which relief could be granted, id. at 123-25, but that, of course, is a disposition different than one based on lack of justiciability.

This court has previously rejected challenges to its ability to hear claims raised against state legislators comparable to the challenges raised here. In Parker v. Merlino , 646 F.2d 848 (3d Cir. 1981), a group of New Jersey state senators brought a S 1983 action against certain other senators alleging that their First Amendment rights had been

13

infringed when they were not permitted to participate in debate on particular tax bills. Like the Senators do here, the defendants in Parker argued that maintenance of the suit in federal court constituted an attack on the sovereignty of the State of New Jersey and its legislative branch. We rejected that argument on the ground that our jurisdiction derived from SS 1983, 1331 and 1343, and we proceeded to reach the merits of the case, which we decided against the plaintiff Senators. See id. at 852 (citing Bond v. Floyd, 385 U.S. 116, 131 (1966) (holding that the Court had jurisdiction to review whether Georgia House of Representatives deprived one of its members of his constitutional rights when it refused to seat him on account of statements he had made criticizing the conduct of the war in Vietnam); see also Baker, 369 U.S. at 229 (citing Kennard v. Louisiana ex rel. Morgan, 92 U.S. 480 (1875) (where federal courts reviewed merits of claim that state public official's removal from office failed to comport with the Fourteenth Amendment's due process guarantee) and Foster v. State ex rel. Johnson, 112 U.S. 201 (1884) (same)); Gomillion v. Lightfoot, 364 U.S. 339, 347 (1960) ("When a State exercises power wholly within the domain of state interest, it is insulated from judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.").

As in Parker, we reject the Senators' argument that respect for the sovereigny of the state requires us to decline to exercise our jurisdiction. While the Senators may deem it inappropriate to find themselves as defendants in a federal court, the overriding fact is that the Fourteenth Amendment and S 1983 were intended to radically alter the distribution of power between the federal government and the states. See, e.g., Quern v. Jordan, 440 U.S. 332, 342 (1979) ("There is no question that both the supporters and opponents of the Civil Rights Act of 1871 believed that the Act ceded to the Federal Government many important powers that previously had been considered to be within the exclusive province of the individual States."). To the extent that S 1983 may be seen as infringing on state sovereignty, Congress, in adopting S 1983 over a century ago, made the determination that such infringement was

14

not only tolerable but necessary to ensure the vindication of federal rights within the states.

Accordingly, although fully cognizant of the respect due members of a state legislature when they act within the sphere of legitimate state interests, we reject the Senators' arguments that Larsen's claims against them are not justiciable. Many of the concerns they raise can be more appropriately addressed in the context of the immunity doctrines rather than by pretermitting the exercise of our jurisdiction through finding a lack of justiciability.

IV.

Legislative Immunity

We turn directly to the immunity issue. In response to Larsen's complaint, the individual Senators filed motions to dismiss on a number of grounds, one of which was legislative immunity. The district court held that the individual Senators were entitled to absolute legislative immunity from claims asserted against them in their personal capacities--claims seeking only monetary relief. See Larsen I, 955 F. Supp. at 1563. However, the district court did not extend the Senators' legislative immunity to Larsen's claims for prospective injunctive and declaratory relief asserted against the Senators in their official capacities. See Larsen II, 965 F. Supp. at 608.

The Senators devote much of their appeal to their contention that the district court erred in limiting the scope of their immunity to Larsen's claims for damages. Larsen, on the other hand, does not argue explicitly in his brief that the district court was correct in limiting the scope of the Senators' legislative immunity to his claims for monetary relief. Rather, he argues that when the Senators were engaged in the impeachment proceedings, they were performing a judicial, not a legislative, function and, therefore, are entitled only to judicial, as distinguished from legislative, immunity. It is settled that absolute judicial immunity extends only to claims for damages; therefore, if Larsen is correct that only judicial immunity were applicable, the Senators would not be entitled to dismissal

15

of the claim for injunctive or declaratory relief. See Pulliam v. Allen, 466 U.S. 522, 540-42 (1984).

On its face, S 1983 "admits of no immunities." Imbler v. Pachtman, 424 U.S. 409, 417 (1976). Nevertheless, courts "have recognized that Congress intended the statute to be construed in the light of common-law principles that were well settled at the time of its enactment." Kalina v. Fletcher, 118 S. Ct. 502, 506 (1997). Thus, the Court has stated that a grant of immunity from suit under S 1983 must be "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." Owen v. City of Independence, 445 U.S. 622, 638 (1980) (quoting Imbler, 424 U.S. at 421). "If parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871--S 1 of which is codified at 42 U.S.C. S 1983--we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for action taken under color of state law." Wyatt v. Cole, 504 U.S. 158, 164 (1992).

The legislative immunity accorded United States Senators and members of the House of Representatives is derived from the Speech or Debate Clause of Article I, S 6, Clause 1 of the United States Constitution. It has long been settled that state legislators are also entitled to absolute legislative immunity from suit under S 1983 for legitimate legislative activities taken in their legislative capacities. See Tenney v. Brandhove, 341 U.S. 367, 372-76 (1951); see also Bogan v. Scott-Harris, 118 S. Ct. 966, 970 (1998). Though this immunity is a creature of federal common law, it is derived from the protection accorded the federal legislators. See Tenney, 341 U.S. at 373-74. Indeed, the Supreme Court has recognized that in civil cases, the scope of the common law legislative immunity accorded state legislators is coterminous with that of the immunity provided by the Speech or Debate Clause. See Supreme Court of Virginia v. Consumers Union of the United States, Inc., 446 U.S. 719, 732-33 (1980).

Recognition of state legislators' entitlement to legislative immunity in S 1983 actions does not end the inquiry because the immunity extends only to acts taken in their

16

legislative capacities. We must still determine whether the Senators performing their role in impeachment proceedings were acting in their legislative or, as Larsen argues, in their judicial capacities. The Supreme Court has adopted a functional approach to immunity issues so that "[w]hether an act is legislative turns on the nature of the act," Bogan, 118 S. Ct. at 973, rather than the nature of the actor's office or his or her intent. See, e.g., Consumers Union, 446 U.S. at 731 (affording legislative immunity to justices of state supreme court when acting in their rulemaking capacity). Therefore, to determine whether a particular immunity is appropriate, we must look to the interests behind it, see Owen, 445 U.S. at 638, remaining mindful that "it is the interest in protecting the proper functioning of the office, rather than the interest in protecting its occupant, that is of primary importance." Kalina, 118 S. Ct. at 507.

The Supreme Court had occasion to examine the extent of legislative immunity when an organization that was the subject of an investigation by a Senate Subcommittee sought to enjoin enforcement of the Subcommittee's subpoena directed to third parties. Eastland v. United States Servicemen's Fund, 421 U.S. 491 (1975). The Supreme Court framed the question to be resolved as "[w]hether the actions of the [Senators] fall within the `sphere of legitimate legislative activity.' " Id. at 501. The Court began its analysis with a discussion of the purpose of legislative immunity, which it explained is "to protect the integrity of the legislative process by insuring the independence of individual legislators." Id. at 502 (quotation omitted). It "prevent[s] intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." Id. (quotation omitted). As such, it reinforces the separation of powers that is fundamental to the structure of both the federal and state governments. See id.; Tenney, 341 U.S. at 372-75. It stated that legislative independence is imperiled whenever the power of the judiciary is brought to bear on the legislature. See Eastland, 421 U.S. at 503.

An additional purpose of legislative immunity is to shield the legislature from the delay and disruption that a lawsuit

17

can bring. "[A] private civil action, whether for an injunction or damages, creates a distraction and forces [legislators] to divert their time, energy, and attention from their legislative tasks to defend the litigation." Id.

Consistent with these purposes, the Court has held that "[a]bsolute legislative immunity attaches to all actions taken `in the sphere of legitimate legislative activity.' " Bogan, 118 S. Ct. at 972 (quoting Tenney, 341 U.S. at 376). To determine whether a particular task is in the sphere of legitimate legislative activity, "we look to see whether the activities took place in a session of the House by one of its members in relation to the business before it." Eastland, 421 U.S. at 503. More specifically, the inquiry is whether the activities are

> `an integral part of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.'

Id. at 504 (quoting Gravel v. United States, 408 US. 606, 625 (1972) (emphasis added)). Most recently, the Supreme Court reaffirmed that legislative immunity attaches to actions taken " `in a field where legislators traditionally have power to act.' " Bogan, 118 S. Ct. at 973 (quoting Tenney, 341 U.S. at 379 (applying principle to state legislators)).

Applying that criteria to legislative action in impeachment and conviction of a federal judge, the Supreme Court noted that the Constitution places impeachment within the sole jurisdiction of Congress. See Nixon v. United States, 506 U.S. 224, 229 (1993). Impeachments take place in session and are the official business before the legislature. It thus unhesitatingly concluded that this is an area where legislatures traditionally have the power to act.

In Nixon, the Court, after reviewing the history of the impeachment clause, stated: "Judicial involvement in impeachment proceedings, even if only for purposes of judicial review, is counterintuitive because it would eviscerate the `important constitutional check' placed on

18

the Judiciary by the Framers." Id. at 235. In The Federalist No. 65, Alexander Hamilton advocated to the people of the State of New York the wisdom in placing the power to try impeachments in the Senate. The Federalist No. 65 (Alexander Hamilton). Though he referred to "the judicial character of the Senate" when sitting for that purpose, he emphasized that impeachments "are of a nature which may with peculiar propriety be denominated POLITICAL." Id. at 439 (Jacob E. Cooke ed., 1961) (emphasis in original). He conceived of the power of impeachment as "a bridle in the hands of the legislative body" id. at 441, and offered two compelling reasons why the courts, particularly the Supreme Court, were an inappropriate repository for the awesome power of impeachment. First, he argued:

> The necessity of a numerous court for the trial of impeachments is equally dictated by the nature of the proceeding. This can never be tied down by such strict rules, either in the delineation of the offence by the prosecutors, or in the construction of it by the Judges, . . . who are to pronounce the sentence of the law and the party who is to receive or suffer it. The awful discretion, which a court of impeachments must necessarily have, to doom to honor or to infamy the most confidential and the most distinguished characters of the community, forbids the commitment of the trust to a small number of persons.

Id. at 441-42.

Hamilton then strengthened his argument with the following reasoning:

> The punishment, which may be the consequence of conviction upon impeachment, is not to terminate the chastisement of the offender. After having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country; he will still be liable to prosecution and punishment in the ordinary course of law. Would it be proper that the persons, who had disposed of his fame and his most valuable rights as a citizen in one trial, . . . for the same offence, be also the disposers of his life and his fortune? Would there not be the greatest

19

reason to apprehend, that error in the first sentence would be the parent of error in the second sentence? That the strong bias of one decision would be apt to overrule the influence of any new lights, which might be brought to vary the complexion of another decision? Those, who know any thing of human nature, will not hesitate to answer these questions in the affirmative; and will be at no loss to perceive, that by making the same persons Judges in both cases, those who might happen to be the objects of prosecution would in a great measure be deprived of the double security, intended them by a double trial.

Id. at 442.

These arguments confirm that the placement in the Senate of the power to try impeachments was not by accident or chance. See id. at 440 (describing the Senate as "the most fit depositary of this important trust"). Rather, the power was consciously assigned to the Senate primarily as a function of the separation of powers. As such, allowing the courts to review the Senate's judgment following trial on impeachment would negate the careful balancing designed by the framers and approved by the ratifiers. Of course, when the impeachment has been of a judge, the need is most imperative for legislative independence from judicial review and for protection from "accountability before a possibly hostile judiciary." Eastland, 421 U.S. at 502.

Although a legislature that sits in impeachment proceedings is not debating, drafting or voting on legislation, "the sphere of legitimate legislative activity," Bogan, 118 S. Ct. at 972, for purposes of legislative immunity, is not so limited. See, e.g., Tenney, 341 U.S. at 379 (state legislators accorded legislative immunity in suit alleging that legislators sought to intimidate and or silence a witness by holding hearing and by encouraging prosecution of witness); Powell v. McCormack, 395 U.S. 486, 506 (1969) (members of Congress accorded legislative immunity in suit challenging refusal by House to seat an elected member); Kilbourn v. Thompson, 103 U.S. 168, 203–04 (1880) (legislative immunity protected legislators from suit challenging issuance of contempt order and arrest warrant for failure to testify).

20

Given that impeachments are matters " `which the Constitution places within the jurisdiction of either House,' " Eastland, 421 U.S. at 504 (quoting Gravel v. United States, 408 US. 606, 625 (1972)), and represent " `a field where legislators traditionally have power to act,' " Bogan, 118 S. Ct. at 973 (quoting Tenney, 341 U.S. at 379), we are convinced that when legislators play the role they have been given in impeachment proceedings, they act within the sphere of legitimate legislative activity and within their legislative capacities. Thus, the necessity for independence requires that legislators be accorded legislative immunity and "not be questioned in any other place," U.S. Const. art. I, S 7, cl. 1, concerning their activity and their decision.

Larsen, to support his argument that impeachment is not legislative in nature, relies on the standards we developed for determining whether certain acts performed at the local level are legislative or administrative. See, e.g., Carver v. Foerster, 102 F.3d 96, 100 (3d Cir. 1996) (citing cases). In making that decision, we ask whether the act is "substantively legislative" as involving policy-making or line drawing and whether it is "procedurally legislative" as being "passed by means of established legislative procedures." Id. The line-drawing between administrative and legislative acts at issue in these cases has no bearing under the situation before us because neither party suggests that the Senators were acting in an administrative capacity. Moreover, because concerns for the separation of powers are often at a minimum at the municipal level, we decline to extend our analysis developed for municipalities to other levels of government.

For the same reason, we are not persuaded that Brown v. Griesenauer, 970 F.2d 431 (8th Cir. 1992), compels a different result. There, the court held that the members of a local board of aldermen that impeached the mayor were entitled only to judicial rather than legislative immunity because it characterized impeachment as essentially a judicial act "that happens to have been done by legislators." Id. at 437. As the preceding discussion makes clear, impeachment is not something that just happened to be assigned to the legislative branch, at least at the state and federal levels.

21

We conclude, therefore, that the Senators were acting in their legislative capacities while engaged in Larsen's impeachment proceedings, and, accordingly, that they were entitled to legislative immunity from claims for damages in their individual capacities. This was the conclusion also reached by the district court in its thoughtful principal opinion. See Larsen I, 955 F. Supp. at 1563. In the discussion of the Eleventh Amendment, the court noted that Larsen had also requested declaratory and injunctive relief against the Senators in their official capacities, specifically the voiding of the Senate impeachment verdict of guilty. The court held that Larsen's claims against the Senate and other state entities, such as the Supreme Court, were barred by the Eleventh Amendment, but that Larsen's request to void the impeachment was one for prospective reinstatement that was not precluded. See id. at 1562.

The district court did not explicitly consider the applicability of legislative immunity to Larsen's request for prospective relief, see id., and it is unclear whether the Senators had invoked that doctrine as to the claims asserted against them in their official capacities. The Senators sought reconsideration on that issue, asking the court to reconsider its holding that absolute legislative immunity does not preclude Larsen's claims against them in their official capacities for prospective injunctive relief. Without any discussion, the court declined to reconsider its prior holding because it believed that its decision was in accordance with prior Third Circuit discussions of this issue, citing Acierno v. Cloutier, 40 F.3d 597 (3d Cir. 1994) (en banc). See Larsen II, 965 F. Supp. at 608–09.

We are aware that language in that opinion may have led to some confusion on this issue. In Acierno, where we considered the availability of legislative immunity to various activities of members of the county council, there is dicta with respect to the scope of legislative immunity that is misleading and, regrettably, incorrect. We stated, inter alia, that "the Supreme Court has never held that legislative immunity applies to both claims for damages and injunctive relief " citing Consumers Union, 446 U.S. at 731–34, and stated further that this court and others have held"that

22

absolute immunity is a bar to damages only, and not to prospective or injunctive relief," Schrob v. Catterson (Schrob II), 967 F.2d 929 (3d Cir. 1992). See Acierno, 40 F.3d at 607 n.8.

Reexamination of the cited cases discloses that in fact the Supreme Court in Consumers Union did resolve the issue of the application of absolute legislative immunity to claims for prospective relief and answered that question in the affirmative. The Consumers Union case presented the Supreme Court with a challenge to attorneys' fees imposed on the Virginia Supreme Court and its Chief Justice by a district court following its holding that the state Bar Code's prohibition of lawyer advertising was unconstitutional. As we noted supra, the Supreme Court held that in promulgating disciplinary rules the Virginia Supreme Court "acted in a legislative capacity." Id. at 731. In the discussion of the consequence in terms of legislative immunity, the Court referenced its earlier decision in Tenney. Its discussion left no doubt of the scope of legislative immunity. It said, "Although Tenney involved an action for damages under S 1983, its holding is equally applicable to S 1983 actions seeking declaratory or injunctive relief. In holding that S 1983`does not create civil liability' for acts . . . `in a field where legislators traditionally have power to act,' we did not distinguish between actions for damages and those for prospective relief." Id. at 732–33 (citation omitted). The Court therefore held both declaratory relief and attorneys' fees were unavailable.

The issue the Court left unresolved in Consumers Union did not concern legislative immunity but whether judicial immunity would bar prospective relief. See Consumers Union, 446 U.S. at 735 ("we have never held that judicial immunity absolutely insulates judges from declaratory or injunctive relief with respect to their judicial acts"). Similarly, the issue in Schrob II did not relate to absolute legislative immunity, but instead was the applicability of absolute prosecutorial immunity from common law tort claims under the Federal Tort Claims Act. See Schrob II, 967 F.2d at 939.

The various immunities, legislative, judicial, prosecutorial and official, have different purposes and characteristics.

23

Unfortunately, the dicta in Acierno did not accurately distinguish between them, as the cases relied upon for the proposition asserted concerned immunities other than legislative.2 We are not obliged to perpetuate that error out of blind adherence to a position articulated in a case where the issue was not squarely before us. " `Wisdom too often never comes, and so one ought not to reject it merely because it comes late.' " Spencer v. Kemna , 118 S. Ct. 978, 990 (1998) (Ginsburg, J., concurring) (quoting Henslee v. Union Planters Nat. Bank & Trust Co., 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting)).

It is likely that our error led the district court astray on that issue in this case. In fact, as noted above, the Supreme Court has unambiguously held that the legislative immunity enjoyed by state, as well as federal, officials is "applicable to S 1983 actions seeking declaratory and injunctive relief." Consumers Union, 446 U.S. at 732; see also Spallone v. United States, 493 U.S. 265, 278 (1990); Eastland, 421 U.S. at 501–03 (applying legislative immunity to United States Senators in action seeking only declaratory and injunctive relief). These cases show that, at least in appropriate cases, legislators are entitled to immunity from claims for injunctive and/or declaratory relief. 3

Legislative immunity must be applied pragmatically, and not by labels. Thus, without attempting to draw a line for

_____

2. In two of the three cases that involved legislative immunity, the courts
agreed that "[l]egislators' immunity is absolute and extends to injunctive as well as damage suits." Resser v. Thompson , 930 F.2d 549, 551 (7th Cir. 1991) (citing Tenney, 341 U.S. 367 (1951)). Accord Alia v. Michigan Supreme Court, 906 F.2d 1100, 1102 (6th Cir. 1990). In the third case, Executive 100 Inc. v. Martin County, 922 F.2d 1536, 1539–40 (11th Cir. 1991), the discussion was dictum as no prospective relief was sought against the local legislators.

3. Larsen is mistaken in his citation of Parker v. Merlino, 646 F.2d 848 (3d Cir. 1981), as illustrating that legislative immunity is inapplicable to
suits for prospective injunctive relief. Parker , discussed supra, involved
a complaint by some New Jersey state Senators against others that they had not been given the opportunity to debate the merits of tax bills. We explicitly noted that the appellants did not raise on appeal the district court's holding that the state legislators were immune only against liability for money damages. See id. at 852 n.11.

all cases, we examine whether Larsen's request for prospective relief from the Senators could be accorded consistent with the policies underlying legislative immunity. The extent to which a court could order relief must be considered in that context. This is not a case where the court, should Larsen be successful, need merely direct the seating of a properly elected legislator, see Bond v. Floyd, 385 U.S. 116 (1966), nor a case where the legislative body had previously agreed to a consent decree to build racially desegregated housing, see Spallone, 493 U.S. at 270-73. Larsen seeks reinstatement – nothing less than that the individual Senators rescind their guilty vote on his impeachment. It is difficult to imagine a remedy that would more directly interfere with the role assigned exclusively to the Senators by the Pennsylvania Constitution.

Larsen's challenges to the impeachment proceedings include the Senate's use of a committee to hear evidence, the absence of some committee members during presentation of evidence, the inadequacy of thefinal report, the format of the report, the inadequacy of the evidence, the factors considered by the Senators in casting their votes, and the alleged consideration by Senators of material outside the record. Larsen candidly states that he"is entitled to discovery on the activities and participation of each senator in the proceedings and decisions." Appellees' Br. at 48.

The extensive discovery Larsen seeks into the motives for the Senators' votes, discussion among them, material each considered and the myriad other matters that enter into any legislator's vote would entail the paradigmatic impermissible questioning of the Senators in another place about their disposition of a matter we have already held lies within the sphere of their legislative activities. See Tenney, 341 U.S. at 377 ("The privilege would be of little value if [legislators] could be subjected to . . . the hazard of a judgment against them based upon a jury's speculation as to motives."). This would also cause the other injury that underlies the need for legislative immunity by diverting their time and attention away from legislative duties. Merely to state the effect is to recognize why legislative immunity

must cover the prospective injunctive relief Larsen seeks against the Senators.4

V.

Conclusion

Accordingly, we conclude that the Senators were entitled to the protections of legislative immunity from suit for Larsen's claims for prospective injunctive relief. Because the immunity issue disposes of the entirety of Larsen's allegations against the Senators, we need not address the issue of whether Larsen possessed a constitutionally protected property interest in his elected position. We will remand the matter to the district court with instructions to dismiss all of Larsen's claims against the Senators.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

4. As the prospective relief sought is of necessity against the Senators in
their official capacities, we do not discourse on the differences between immunity in their individual as distinguished from official capacities.

26